941 A.2d 1127

**Sandra S. ELDERKIN, et al.**

v.

**Douglas G. CARROLL, III.**

**No. 57, Sept. Term, 2007.**

Court of Appeals of Maryland.

Feb. 14, 2008.

John H. Zink, III, (Venable L.L.P., Towson, MD), on brief for Appellants.

Richard C. Burch (Mudd, Harrison & Burch, L.L.P., Towson, MD), on brief, for Appellee.

Argued Before BELL, C.J., and RAKER, HARRELL, BATTAGLIA, GREENE, LAWRENCE F. RODOWSKY,* (retired, specially assigned) and DALE R. CATHELL (retired, specially assigned), JJ.

CATHELL, J.

This case originated in Baltimore County and involves an option for the sale of land from Sandra Elderkin, Donald Elderkin ("appellants"), and their brother, Clarence Elderkin [1] to Douglas Carroll ("appellee").[2] Appellee argues that he exercised the option. Appellants disagree. Carroll filed a complaint on July 13, 2005, against appellants in the Circuit Court for Baltimore County to specifically enforce the option, and additionally, claimed that appellants were enriched unjustly by expenses [3] incurred by appellee in obtaining permits and approvals for an access road to the land at issue.

---

* While Judge Rodowsky heard oral argument in the above case, he did not participate in the adoption of this opinion.

1. On July 6, 2006, one defendant, Mr. Clarence Elderkin, transferred his one-third interest in the land at issue to Quarry Lakes, L.L.C., a Maryland company, in which he was the sole member. Quarry Lakes had been formed by appellee Carroll. Mr. Clarence Elderkin, then conveyed his interest in Quarry Lakes to appellee. After Clarence Elderkin conveyed his interest in Quarry Lakes to appellee, Mr. Clarence Elderkin was deleted as a defendant via an amended complaint in the trial court. Mr. Clarence Elderkin is not a party to this appeal.

2. There is a serious question in this case as to whether there was ever a sufficient meeting of the minds for there to have existed an option agreement in the first instance. As both parties presume its existence and framed the issue around whether it was properly exercised or not, we shall also limit our resolution to that issue.

3. See *Caroline County Comm'rs v. Dashiell & Sons, Inc.*, 358 Md. 83, 747 A.2d 600 (2000), and cases cited therein, where we reiterated the long standing doctrine in Maryland that a person making a claim based

Prior to trial, appellee withdrew all claims excepting specific performance. That trial commenced on December 11, 2006, without a jury. On December 12, the Circuit Court granted appellee specific performance, but no written judgment was filed. On December 19, appellants filed a Motion to Amend Judgment pursuant to Maryland Rule 2–534, requesting that the court clarify the date on which appellee exercised the option to purchase the land at issue. Additionally, appellants requested that the court state the terms and time frame for them to convey the land at issue. Accordingly, on January 9, 2007, the Circuit Court for Baltimore County ordered appellants to convey the land on or before April 4, 2007, subject to their right to appeal. Appellants exercised that right by filing a timely notice of appeal from both the judgment entered on December 12, 2006, and the order filed on January 9, 2007. On our own initiative, we issued a writ of certiorari before the case was heard in the Court of Special Appeals to determine whether Maryland law requires the timely exercise of an option contract in strict accord with its terms. *Elderkin v. Carroll,* 400 Md. 646, 929 A.2d 889 (2007).

## Question Presented

*"Does Maryland law require the timely exercise of an Option in strict accord with its terms, and, if so, did Mr. Carroll comply with those requirements?"*

We shall hold that the failure to deliver a required deposit check to the seller along with the contract, constituted a material failure to comply with the terms of the option agreement, and consequently resulted in a failure on the part of appellee to successfully exercise the option.

## I. Facts

The facts of this case are largely undisputed. Appellee desired to purchase a 63 acre tract owned by appellants. That tract was described as two separate lots; the "Front Lot," consisting of 18 acres of improved land with direct access to

---

upon an express contract, generally, may not also rely on the doctrine of unjust enrichment.

Greenspring Valley Road and/or Stevenson Road, and the "Back Parcel"[4] which consisted of 45 acres of unimproved land that had no direct access to the roads. Ultimately,[5] appellants and appellee came to an initial agreement for the purchase of all the land, for a total of $3 million, in two stages. The Front Parcel (the Front Lot) was sold for one million dollars. That initial contract of sale included a reference to the Back Parcel, which stated:

> "Sellers agree to [sign] a standard contract to sell the 45 acre remaining tract to the Buyer for a period lasting until June 30th, 2005. Buyer will attempt to obtain a contract from a third party to purchase this tract for a price of $2 million (net to seller)...."

The first sale closed on April 15, 2005, and appellants conveyed the Front Parcel to appellee for $1 million. At closing, appellee was presented with an amendment which the parties believe granted him an option (the second contract) to purchase the Back Parcel. It stated, in relevant part:

> "(c)(1) For the consideration to be outlined in subparagraph (7) below, which consideration shall be in addition to the purchase price for the Option Property (the "Option Property" is that parcel of ground [referred to as the Back Parcel]) in the event this option to purchase is exercised, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows.
>
> "(2) The Seller offers to sell and convey to the Buyer and hereby grants to the Buyer the exclusive, assignable, and

---

**4.** The record reflects that the parties described the front piece of property as the "Front Lot" and the back piece of property as the "Back Parcel." Parcel and Lot apparently are synonymous as used by the parties.

**5.** Initially there was a contract of sale. It was the first contract. The parties disagreed over the interpretation of its terms and resolved that disagreement by executing an amendment on the date of the closing on the Front Parcel. The amendment was, in effect, the second contract. The amendment included the option provision in respect to the Back Parcel. It is this amendment, i.e., the second contract, that created a primary source of controversy.

irrevocable option to purchase the Option Property . . . subject to the terms and conditions set forth herein and in the form of a standard Maryland Board of Realtors contract of sale to be hereafter executed, pursuant to which the Seller must receive net proceeds of no less than Two Million Dollars after satisfaction of all costs, expenses, fees, and other deductions relating to the sale and closing on the [Back Parcel]. . . .

"(3) The Buyer's option to purchase the Property must be exercised by the Buyer on or before June 30, 2005. If the option to purchase is not exercised on or before that date, this option to purchase shall automatically cease and terminate, neither party shall have any further rights hereunder, at law or in equity, and the Agreement shall be null and void, all without further action or documentation by either party, unless otherwise agreed to by all parties. Closing under the Contract of Sale must be set forth no later than ninety days from the date of contract execution. The date of option expiration shall remain confidential, and no party shall disclose said date to any third party during the unexpired option period.

"(4) The Buyer's option to purchase shall be exercised by the timely delivery to the Seller at the Seller's address (or to the Seller's attorneys) of two copies of the Contract of Sale duly executed by the Buyer, together with a check payable to the order of the Seller for the amount of the earnest money deposit specified in the Contract of Sale.[6] Promptly upon receiving the same the Seller shall execute both copies of the Contract of Sale and return one fully executed copy to the Buyer. The failure of the Seller to execute and return a fully executed copy of the Contract of Sale to the Buyer shall not affect its enforceability and the Contract of Sale shall be binding upon and enforceable

---

6. Apparently at this point there was no set amount for the earnest money deposit. If the amount of the earnest money deposit had not been later negotiated, it is doubtful that a deposit of any amount other than the entire purchase price could have served to exercise the option (if in fact a valid option ever existed).

against the Seller in the same manner as if it had been executed by the Seller and returned to the Buyer.

"(5) In the event that Buyer exercises the Option to purchase within the time and in the manner herein before provided, then thereafter the rights, duties, and obligations of each party with respect to the Property shall be governed by the terms and conditions contained in the Contract of Sale.[7]

"(6) Time shall be of the essence of this Option Agreement.

"(7) The consideration paid by Buyer to Seller for this Option shall be as follows.

"(A) Buyer shall obtain within the option period at his own effort and expense all necessary permits and other required allowances by Baltimore County, the State of Maryland, and any other relevant regulatory body to build an access road from Greenspring Valley Road to Parcel 362 appropriate for access to residential property to be built on Parcel 362. . . .

"(B) Buyer shall obtain within the option period at his own effort and expense Baltimore County and/or State of Maryland approval that the 50–foot wide access strip contemplated herein shall be owned by Seller in fee simple, whether by lot line adjustment or subdivision. . . ."

Appellee's first attempt to exercise the option occurred when he submitted a new contract in April 2005. This would have been the third contract. It had been drafted prior to the negotiation and signing of the second contract (i.e., the amendment signed on the closing date of the first contract), and consequently, did not comply with the terms of the amendment/second contract.[8] Appellants' attorney, Mr. Williams, responded to appellee via letter dated May 5, 2005. After

---

7. If the terms and conditions were, at this point, to be left to future negotiation, it is doubtful that any enforceable option existed at this point in time.

8. This "third contract" and the "contracts" that followed apparently were meant to be the exercise of an option alleged to have been created by the second contract (i.e., the amendment to the first contract).

stating that overall, the new contract appeared to be fine, Mr. Williams pointed to several failures of the contract, including: (1) the wrongful inclusion of the 50–foot access strip, pursuant to paragraph 14(c)(7) of the second contract; (2) a change in the original purchase price, noted in paragraph 14(c)(2) of the second contract, to include the payment of $100,000 to the buyer's agent, Heidi Krauss; and (3) the reduction of the purchase price by a $15,000 clean up fee. In their brief, appellants point to several more deficiencies, including: (1) the non-payment of the $50,000 deposit as required by paragraph 14(c)(4) of the second contract;[9] (2) the failure of the (third) contract to reflect the terms of a standard Maryland Board of Realtors contract of sale as required by paragraph 14(c)(4) of the Amendment.

Appellee then asked his realtor, Heidi Krauss, to prepare a standard contract (the fourth contract). After appellee made revisions, he submitted this fourth contract to appellants' attorney, Mr. Williams, on May 20, 2005. Mr. Williams, replied via letter dated May 24, 2005, noting several deficiencies in appellee's new attempt to exercise the option, which primarily included an incorrect description of the property that included the 50–foot access strip and unacceptable additional terms. In appellants' brief, they note additional deficiencies, including: (1) an incorrect settlement date; (2) the non-payment of the $50,000 deposit, because that "fourth" contract included a paragraph that provided that appellee had delivered a deposit check, in the amount of $50,000, to his agent, Ms. Krauss, payable to Coldwell Banker, to be held in escrow, instead of delivering a check payable to the sellers to them or their attorney; (3) the wrongful inclusion of a financing contingency; (4) addendums that included additional terms of a $15,000 clean up fee, and a provision to make the $50,000 deposit refundable for 45 days.

---

9. While paragraph 14(c)(4) did not note the exact amount of the deposit, various correspondence between appellants and appellee make mention of the $50,000 deposit, and the amount is undisputed between the parties. Accordingly, we shall not further address the amount of the "deposit" required.

Appellee's next attempt to exercise the option was delivered to appellants' attorney on June 23, 2005. While no communication was made to appellee regarding its deficiencies, appellants note in their brief the following: (1) the new contract (the fifth contract) again required a $50,000 deposit to be held in escrow by Coldwell Banker; and (2) unacceptable addenda that were submitted with the new contract, but were crossed out. The first addendum required a $15,000 deposit to be held in escrow for property clean up, and the second addendum accorded appellee the right to form a limited liability company and to convert the contract to transfer of an interest in the limited liability company. It further required that appellants pay their own attorney's fees for the transaction.

Thereafter, as a result of appellants' failure to respond to appellee's numerous communications, appellee retained an attorney.[10] On June 30, 2005, the last day the option could be exercised, appellee and his attorney were able to reach appellants' attorney, Mr. Williams via telephone. At that time, Mr. Williams informed appellee that he was under no obligation to give an explanation as to the deficiencies of appellee's third attempt to exercise the option contract. Appellee attempted one final time to exercise his option, and submitted another contract to Mr. Williams (this would have been the sixth contract), along with a copy of the $50,000 deposit check payable to Coldwell Banker, which still was to be held by Ms. Krauss. On July 1, 2005, Mr. Williams sent a letter to appellee's attorney informing appellee that his attempt to exercise the option was neither unequivocal or in accordance with the terms of the option, and referred specifically to: (1) the failure of appellee to make a cash deposit of $50,000 to the sellers; and (2) an addendum in the sixth contract that included a feasibility study for house site and access within 14 days from contract acceptance.

As noted above, appellee filed a complaint in the Circuit Court for Baltimore County on July 13, 2005. Ultimately, that

---

10. This apparently was the first time appellee sought the services of an attorney.

court granted appellee specific performance, subject to the appellants' right of appeal, which was exercised on December 12, 2006, via a Notice of Appeal. Before the case could be heard in the Court of Special Appeals, we issued a writ of certiorari on our own motion. *Elderkin v. Carroll,* 400 Md. 646, 929 A.2d 889.

## II. Standard of Review

Pursuant to Maryland Rule 8–131(c), the scope of appellate review in cases where an action has been tried without a jury requires the reviewing court to: "review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." While the judgment of the trial court based on factual findings may only be set aside when "clearly erroneous," the review on matters of law differ. "The 'clearly erroneous' portion of Md. Rule 8–131(c) does not apply to a trial court's determinations of legal questions or conclusions of law based upon findings of fact." *Southern Mngm't Corp. v. Kevin Willes Const. Co., Inc.,* 382 Md. 524, 539, 856 A.2d 626, 634–35 (2004). When the ruling of a trial court requires the interpretation and application of Maryland case law, we give no deference to its conclusions of law. *White v. Pines Community Improvement Ass'n,* 403 Md. 13, 939 A.2d 165 (2008); *YIVO Institute for Jewish Research v. Zaleski,* 386 Md. 654, 662–63, 874 A.2d 411, 415–16 (2005); *Nesbit v. Government Employees Ins. Co.,* 382 Md. 65, 72, 854 A.2d 879, 883 (2004).

## III. Discussion

We have defined an option contract as: " '[A] continuing offer to sell during the duration thereof which on being exercised by the optionee becomes a binding and enforceable contract.' " *Straley v. Osborne,* 262 Md. 514, 521, 278 A.2d 64, 68 (1971) (quoting *Diggs v. Siomporas,* 248 Md. 677, 681, 237 A.2d 725, 727 (1968); *David A. Bramble, Inc. v. Thomas,* 396 Md. 443, 455, 914 A.2d 136, 143 (2007)). To effectively exer-

cise that option, the acceptance must be: " 'unequivocal and in accordance with the terms of the option.' " *Bramble*, 396 Md. at 455, 914 A.2d at 143 (quoting *Katz v. Pratt St. Realty Co.*, 257 Md. 103, 118, 262 A.2d 540, 547 (1970)); *See Simpers v. Clark*, 239 Md. 395, 401, 211 A.2d 753, 756 (1965) ("[I]t is well settled that the exercise [of an option] must be unconditional and in accordance with the terms of the option."); *Foard v. Snider*, 205 Md. 435, 446, 109 A.2d 101, 105–06 (1954) ("Whatever the option requires must be done. . . . [T]he exercise must be unconditional and in exact accord with the terms of the option.").

Courts have differed as to the extent the "exact matching" requirement must be applied. A leading case on that issue is *Katz v. Pratt St. Realty Co.*, 257 Md. 103, 262 A.2d 540. There, the parties both owned common stock in The Pratt Street Company. In an attempt to facilitate the dissolution of that company, they entered into a mutual option agreement to purchase certain parcels of land owned by that company. The first option allowed for the purchase of a parcel on Portland Street *and* a group of other combined properties. The second option allowed for the purchase of the Portland Street property *or* the combined properties. The optionee, in a timely manner, attempted to exercise the second option, which allowed only for the purchase of one property—the Portland Street parcel—but reserved the right to purchase the combined properties. In determining whether that was a permissible exercise of the option, we stated:

> "If the exercise of the option is positive and unequivocal, the inclusion of an inquiry, a request for an additional benefit, a suggestion of a modification will not invalidate an acceptance if it is clear that the acceptance is not conditioned on the granting of the request. What the [optionee] did in their [attempt to exercise the option] was to add not a condition, but a completely extraneous comment covering their interpretation of the [option agreement]".

*Katz*, 257 Md. at 119, 262 A.2d at 548.

A later case discussing the "exact matching" requirement is *Beckenheimer's Inc. v. Alameda Associates Ltd. P'ship*, 327

Md. 536, 611 A.2d 105 (1992). The optionee was a sublessee for a food supermarket premises in a shopping center that had originally been leased to Acme, who in turn had a priority lease with Alameda Associates. In order to exercise its option to renew, the optionee was required to give 120 days notice, that the optionee not be in default, and that: " *'the net worth of [the optionee] on the date of such notice (as evidenced by the most recent certified financial statements of [optionee] which shall be included with such notice) is at least equal to the net worth of [the optionee] on the date hereof.'* " *Beckenheimer's Inc.*, 327 Md. at 540, 611 A.2d at 107. The optionee gave a timely notice of renewal, but failed to include a statement of financial worth. As a result, Acme, the optionor, informed the optionee that it considered the lease expired, since the notice of renewal did not comply with the terms of the sublease. The trial court in that case granted summary judgment, finding that the optionee had failed to renew the sublease validly.

On appeal, this Court noted that actual condition of renewal of the sublease required a specified net worth of the optionee, and that the provision requiring a certified statement of net worth was for the optionor's convenience in determining that net worth. Further, the term "certified financial statements" was ambiguous at best. It therefore made a distinction between "conditions," which would have to be fulfilled prior to renewal (or exercising the option) and "covenants," which, if not matched exactly, would not necessarily bar renewal. As a result, we concluded:

> "The breach by [the optionee] of the covenant to include a financial statement with the notice of renewal is not a material breach. Seemingly, only nominal damages are involved as compensation for the breach. Inasmuch as the three express conditions precedent to[optionor's] contractual duty to renew have been fulfilled, equity could specifically enforce the covenant to renew." (Footnote omitted.)

*Beckenheimer's*, 327 Md. at 555–56, 611 A.2d at 114. It is, however, an important distinction that in *Beckenheimer's*, the Court was reviewing the case to test the strength in favor of

the summary judgment granted by the trial court. That standard does not apply to the case at bar.

Most recently, in the case of *David A. Bramble, Inc. v. Thomas,* 396 Md. 443, 914 A.2d 136, while we specifically did not decide whether an option holder must "match literally all the terms in the triggering offer in order to exercise its right...." *Id.* 396 Md. at 460, 914 A.2d at 146, we did state: "Maryland requires generally the literal matching of terms in cases involving the formation of binding contracts...." *Id.* Additionally, however, we noted that even in jurisdictions where an option holder is required to match exactly the terms of a triggering offer, and where a lack of materiality of omitted terms is no defense, there remain three exceptions to that rule:

> "(1) the property owner may waive exact matching, either through actions or express waiver; (2) proper names need not be matched ... and (3) the property owner, for the purpose of discouraging the holder of the preemptive right of first refusal, may not insert into the triggering offer terms which it[ ] knows will be repugnant to the holder."

*Id.* 396 Md. at 462, 914 A.2d at 147.

These cases seem to illuminate particular inquiries that must be made in determining whether the exercise of an option is valid: (1) is the acceptance in accordance with the terms of the offer? (2) Do the non-matching terms fall under any of the exceptions enunciated in *Bramble?* (3) Where the terms are not in accordance, was it merely an "additional term" that could be rejected by the optionor or was it a non-material covenant rather than a condition? In the instant case, we shall examine the relevant contracts submitted by appellee to answer these questions.

**Contract No. 3 (the first attempt to exercise the option)**

The first defect alleged by appellants in their brief is the property description, which wrongfully included the 50–

foot access strip.[11]   In the Contract of Sale and its Amendment (the second contract), *supra,* the property description specifically excluded that 50–foot access strip.   To the extent that the 50–foot access strip specifically was excluded from the option property, it was a condition of the option, i.e., the property being sold was everything in the 45 acre tract *except* the 50–foot access strip.   Where that term was added by appellee when he later attempted to exercise his option, it could not be simply an "additional term," which could have been rejected by appellant.   As such, when appellee attempted to include it he did not satisfy a condition of the sale.

The second defect was the change in the purchase price to reflect payment of appellee's obligation to Ms. Krauss.   Appellants objected. The purchase price was a material term in the contract.   "[T]he purchase price is an essential term of any land sale contract."   *Bramble,* 396 Md. at 459 n. 12, 914 A.2d at 146 n. 12.   It therefore should have been matched exactly. Another, similar defect alleged by appellants was a reduction in the purchase price by a $15,000 "clean up" fee.   Given its location in the contract, i.e., it was not included as an addendum, but rather was referred to in the "Purchase Price" section of appellee's first proposed contract (the third contract), this was a change in the purchase price, which again would be a material change (as contrasted with Contract No. 4, *infra* ).

The primary defect, and the defect that we shall hold to be the ultimate failure with every attempt (all the proposed contracts/exercises) on behalf of the appellee to exercise the option, was a failure on the part of the appellee to submit a deposit *to the seller, payable to the seller, with the Contract.* In his attempt to exercise the option, appellee included a clause that required him to pay the deposit within five days of the contract.   As the option required that the deposit be

---

11.   The property description in the first contract submitted by appellee stated:   "The property being purchased includes a fee simple interest in a 50 foot wide access to frontage on Greenspring Valley Rd. . . . ."   (Joint Record Extract, p. 97)

submitted with the contract as a condition of sale, this was a material omission on the part of appellee.

The fourth alleged defect was the form of the Contract. The Amendment to the Contract, i.e., the second contract, included in paragraph 14(c)(2), a requirement that the contract be "in the form of a standard Maryland Board of Realtors contract of sale." This may or may not have been a material defect; we need not make a determination on this particular alleged defect, as there were a sufficient number of material deficiencies to find that this first attempt to exercise an option and the presentation of this third contract was not a valid exercise of the option. We will note, however, that there exist significant differences in the contract submitted by appellee and a standard Maryland Board of Realtors contract of sale provided in the Joint Record Extract.

### Contract No. 4 (the second attempt to exercise the option)

█ This version of the contract was submitted correctly on a standard Maryland Board of Realtors contract of sale, but continued to contain material deficiencies. The first was an incorrect settlement date; the contract noted that date to be "90 Days from June 30, 2005," but that date did not conform to the requirements listed in paragraph 14(c)(3) of the Amendment (second contract), which stated: "Closing under the Contract of Sale must be set forth no later than ninety days from the date of contract execution." As the contract was submitted by appellee on May 20, 2005, the date noted on the contract would have been more than 90 days from the date the contract could be executed. This was a material defect, as the Amendment (second contract) specifically stated that: "Time shall be of the essence of this Option Agreement." Time is a material term in a contract. *Cf. Foard v. Snider*, 205 Md. at 446, 109 A.2d at 106 ("Time is of the essence in a unilateral contract, such as an option, both in law and in equity, whether expressly declared to be so or not.... Each such agreement must be scrutinized to see what it requires to be done within the specified time, either expressly or by necessary implica-

tion.") Such a defect, alone, would not have allowed appellee to exercise the option via this attempt. Other material defects also existed.

Another defect again involved the $50,000 deposit. On this attempt, appellee still did not deliver the deposit; instead, he again delivered a check in the amount of $50,000 to Ms. Krauss, again payable to Coldwell Banker and not to sellers—to be held in escrow.[12] As stated above, this remained a material defect as the Amendment (second contract) provided that the deposit be delivered with the contract *to the seller.*

Another material defect in this fourth contract was the property description, which conveyed to appellee "[a]ll existing means of access . . . ." This again did not match the property description in the Amendment (second contract) that specifically excluded the 50–foot access strip. As it implied that the 50–foot access strip would be included in the property conveyed, this would constitute a material defect, as explained *supra.*

Another alleged defect was a financing contingency included in the fourth contract (the second attempt to exercise the option). Appellants argue that appellee was obligated to submit a contract that contained no contingencies except title, pursuant to an email sent by appellee to appellants on April 14, 2005, which stated: "As to the terms of the sale, I pay $50,000 down by June 30th and settle within 90 days for net $2 million, no contingencies except title. These are reasonable terms." (Joint Record Extract, p. 80) We do not agree that these terms became part of the option contract. These terms are precisely the types of terms that are referred to in *Katz v. Pratt St. Realty Co., supra.* The April 14, 2005, email appears to be, as the *Katz* court put it: "[A] completely extraneous comment covering [his] interpretation of the [option agreement]." *Id.* 257 Md. at 119, 262 A.2d at 548. The same holds true for the second defect alleged by appellants, which was the

---

**12.** It was revealed during direct examination that Ms. Krauss was a real estate agent affiliated with Coldwell Banker. (Joint Record Extract, p. 316)

inclusion of an addendum requiring $15,000 to be held in escrow as a "clean up" fee. Its location in the contract, as an addendum, made it a term that would not nullify the attempt to exercise the option in and of itself, but rather, it was a request for a modification that could have easily been rejected by appellants. Given, however, the other material defects listed above, this fourth contract was not a valid exercise of the option agreement.

### Contract No. 5 (the third attempt to exercise the option)

In appellants' brief, they allege two defects with this new contract. We shall hold one to be material and not reach the other. That material defect remained the failure to deliver the $50,000 deposit payable to the seller;[13] appellee submitted only a copy of the deposit check given to Ms. Krauss, and again noted in this contract that it was to be held in escrow by Coldwell Banker. The failure to deliver the deposit payable to the seller along with the contract to appellants remained a material breach.

The second defect alleged by appellants was the two addenda that were submitted with this contract. There existed

---

13. If an optionee desires to protect itself in respect to such deposits he merely has to provide in the option contract that the deposit will be made in a particular manner other than depositing it with the optionor. When, however, he provides that it will be deposited with the seller, payable to the seller, it is material.

The materialness of the method is exhibited by the different remedies should the buyer fail to fully perform the agreement. If there is a failure to perform on the part of the buyer and the seller has the deposit, the seller, absent court action dictating otherwise, can retain the deposit under his control pending a proper determination of the buyer's remedies. If a buyer, however, deposits such a sum with his agent, and then desires not to consummate the sale, he merely directs his agent to return the deposit to him, and the seller's only remedy is a complaint for specific performance. If the buyer deposits the money with an escrow agent and then determines not to consummate the sale, the escrow agent may file the deposit in court under a Bill of Interpleader and the seller and buyer then fight over the money in court or the seller files a Bill for Specific Performance, or both. The seller's remedies are drastically different when deposits are held by others as opposed to when the seller has the deposit.

some confusion as to whether the addenda were actually part of the contract, as there were "X's" drawn through them.

## Contract No. 6 (the fourth and final attempt to exercise the option)

■ This contract was submitted on the last day that the option could be exercised, June 30, 2005. The material failure with this contract remained the failure to deliver a deposit payable to the sellers, with the contract to sellers (appellants); appellee continued to leave the check, made payable to Coldwell Banker, in the possession of Ms. Krauss. Appellants allege an additional material defect, which was a new addendum that granted appellee a feasibility study which would give him the option, at his sole discretion, to terminate the contract based on his review of the property within 14 days from contract acceptance. To the extent it was part of this contract, it was a material difference.

## Good Faith

■ Appellee argued both in his brief and at oral argument, that his failure to exercise the option was due to the failure on the part of appellants to exercise good faith. In this light, we have held that:

> "[O]ne who enters into a contract must cooperate in good faith to carry out the intention the parties had in mind when it was made; and that he should not be permitted to engage in any subterfuge or devious means to prevent the other party from performing, and then use that as an excuse for failing to keep his own commitment."

*Bramble*, 396 Md. at 461, 914 A.2d at 147 (citing *Weber Meadow–View Corp. v. Wilde*, 575 P.2d 1053, 1055 (Utah 1978)). *See also Port East Transfer, Inc. v. Liberty Mut. Ins. Co.*, 330 Md. 376, 385, 624 A.2d 520, 524 (1993) ("Even when the parties are silent on the issue, the law will impose an implied promise of good faith."); *Straley v. Osborne*, 262 Md. 514, 524, 278 A.2d 64, 70 ("[T]he [property owner-lessor] cannot act in derogation of the [holder-lessee's] 'first option' rights in the leased premises . . . .").

In the instant case, appellee argues that the failure of appellants' attorney, Mr. Williams, to explain the defects with each of the contracts, despite repeated requests to do so, constituted bad faith on the part of appellants. We disagree. Our own research has not revealed any case law that places on the optionor a duty to inform the optionee of his failure to adequately exercise the contract. To the contrary, we note several cases that have held that there is no duty to inform. First, in order to highlight the difference, we discuss a case where such a duty would be required.

In an early case dealing with the sale of realty, we noted an example of noncompliance with the good faith requirement. In *Brewer v. Sowers,* 118 Md. 681, 86 A. 228 (1912), Sowers and Brewer entered into an option agreement for the purchase of property that had to be exercised by November 1, 1910. It required that $1,500 cash be delivered to Brewer by that date. Evidence was introduced showing that Sowers deliberately evaded Brewer, which resulted in Brewer's inability to exercise his option. There, we stated:

"Sowers not only notified Brewer of his acceptance of the option before November 1 st, 1910, but he did everything that could be required of him in his effort to pay the $1,500 to Brewer, and, failing to find him, paid that sum into Court on November 1st.... [Brewer] resist[ed] the performance of the contract in every possible way, and Sowers was not only willing to perform it himself, but was at the very time the money was to have been paid asking the aid of the Court to require Brewer and his wife to accept it and perform their part of the contract. To deny Sowers relief under such circumstances, on the ground that the balance of the purchase money was not actually paid by the time named in the agreement, would not only be without precedent, but contrary to every principle of justice and equity which are supposed to control Courts of Equity."

*Brewer,* 118 Md. at 685–86, 86 A. at 230.

In contrast to *Brewer, Levy v. Baetjer,* 198 Md. 240, 81 A.2d 644 (1951), is a case where a purchaser also put forth a good

faith defense as a reason for not timely exercising a contract to purchase real property. Levy contracted to purchase a parcel of land from Baetjer, with settlement to be made on or before July 10, 1950. Additionally, the contract was contingent upon Levy's purchase of a right of way into the property across some adjacent property, which, if not obtained by the settlement date, would render the contract null and void. On May 24, 1950, the real estate broker, working on behalf of Levy, wrote a letter to Baetjer requesting an extension to August 1, 1950, and Baetjer agreed to this extension. After encountering difficulties in obtaining the right of way, the real estate broker again wrote to Mr. Baetjer on July 20, 1950, requesting another extension. There was no reply to that letter. On August 7, 1950, Levy tendered a check to the real estate broker to obtain the parcel without the right of way. That same day, when the broker attempted to deliver the check to Baetjer, the broker was advised by Baetjer that he "would have to let him know later." *Levy,* 198 Md. at 242, 81 A.2d at 645. On August 11, 1950, Baetjer called the broker to advise him that the property was sold. Levy contended that Baetjer's failure to respond to the letter constituted a " 'fraudulent, deliberate and intentional failure to immediately answer the letter' [requesting an extension, which] lulled [Levy] into the belief that the request was granted...." *Levy,* 198 Md. at 242–43, 81 A.2d at 645. We held: "[W]e are aware of no case which states that a party to a contract is under any duty to answer a letter asking for an extension of time, or that his failure to answer such a letter constitutes fraud. *The remedy was entirely in the hands of [Levy]....*" *Levy,* 198 Md. at 243, 81 A.2d at 645. (Emphasis added.) *Cf. Diggs v. Siomporas,* 248 Md. 677, 237 A.2d 725 (1968) (holding that where the performance of an option was prevented solely by the action of the optionor in refusing to accept the balance of the purchase price, the optionee was entitled to specific performance); *Trotter v. Lewis,* 185 Md. 528, 45 A.2d 329 (1946) (holding that specific performance is based on the concept that an option is a continuing offer to sell, and when properly enforced, it becomes binding and enforceable).

These cases seem to lead to the proposition that the good faith requirement does not impose upon the seller an additional duty to make the sale easier for the buyer, but rather that a seller cannot act in a manner that improperly attempts to defeat the exercise of the purchaser's contract rights. Indeed, in the case of *David A. Bramble, Inc. v. Thomas*, 396 Md. 443, 914 A.2d 136 (a case involving a right of first refusal as opposed to a pure option [14]), while making no ruling on whether such an act was done in good faith, as it was a question of fact not appropriate for review of a summary judgment, we stated that:

"We agree with Respondents that the [sellers] were free to structure the sale of their property in any way they saw fit; however, [the parties] were obliged to comport with notions of good faith and fair dealing with regard to Bramble's preemptive right in setting the terms of the sale. If an aggrieved holder of a [preemptive right] satisfies a court that the property owner's and/or third-party's actions are arbitrary or performed in bad faith, the owner of the property encumbered by the preemptive right must articulate a 'reasonable justification' for its actions."

*Bramble*, 396 Md. at 467, 914 A.2d at 150 (citing *Prince v. Elm Inv. Co.*, 649 P.2d 820, 825 (Utah 1982)). *Cf. Am. Trading & Prod. Corp. v. United States*, 172 F.Supp. 165, 167 (D.Md. 1959) ("there is 'an implied provision of every contract ... that neither party to the contract will do anything to prevent

---

**14.** A right of first refusal is a type of option. *Bramble*, 396 Md. at 456, 914 A.2d at 143 (citing *Ferrero Construction Co.*, 311 Md. 560, 567, 536 A.2d 1137, 1140 (1988)). It is sometimes referred to as a *preemptive* right. They differ in that for a right of first refusal to be triggered, the owner must desire to sell the property **and** to have received an offer to purchase from a third party. *Selig v. State Highway Admin.*, 383 Md. 655, 668, 861 A.2d 710, 718 (2004) (citing *Ferrero*, 311 Md. at 565, 536 A.2d at 1139). *See Straley v. Osborne*, 262 Md. at 522, 278 A.2d at 69 ("a 'first option,' [or right of first refusal] ... [is] conditional upon [the owner's] decision to sell"). An option, conversely, is an actual contract right to buy. *Id.* There, the property is ready to be sold and the buyer can force the owner to sell even in the absence of another offer to purchase. It is contingent only upon the optionee's decision to purchase and the proper exercise of the option.

performance thereof by the other party' ..." (quoting *George A. Fuller Co. v. United States,* 108 Ct.Cl. 70, 69 F.Supp. 409, 411 (1947))); *Straley v. Osborne,* 262 Md. at 524, 278 A.2d at 70 ("the [property owner] cannot act in derogation of the [option holder's] 'first option' rights in the [ ] premises"); *Gardiner v. Gardiner,* 200 Md. 233, 240, 88 A.2d 481, 484 (1952) ("courts will not reform or rescind such contracts ... when there is no fraud, misrepresentation, mistake, undue influence, or fiduciary relation shown to exist, or unless the equities are such that they should not be enforced").

Finally, in the case of *Chesapeake Bank of Maryland v. Monro Muffler/Brake, Inc.,* 166 Md.App. 695, 891 A.2d 384 (2006), the Court of Special Appeals held that there was no duty to inform a lessee that the deadline for exercising an option to extend a lease had passed. There, the lessee, by mistake, failed to give notice of its intent to renew a commercial lease until after the deadline. The lease required that notice of intent to renew be given 90 days before the expiration of the lease, which would expire October 31, 2002. The lessee sent a letter informing the lessor of its intent to renew on August 29, 2005. The lessor refused to renew the lease, claiming that the renewal date had passed on August 2, 2002. It was argued by the lessee that various communications had transpired between the lessee and the lessor, and no mention was made that the date for renewal was approaching or had passed. There, the Court of Special Appeals stated:

> "We are not persuaded that the [lessor's] failure to give [the lessee] notice that the deadline for extending the lease had passed supports [the lessee's] equitable argument. The [lessor] did not have a duty to inform [the lessee] that the deadline was approaching or that it had passed."

*Chesapeake Bank of Maryland v. Monro Muffler/Brake, Inc.,* 166 Md.App. at 719, 891 A.2d at 398. *Accord, Ganson v. Goldfader,* 148 Misc.2d 608, 561 N.Y.S.2d 366, 369 (1990) ("the landlord had no duty to personally notify [the tenant] of the upcoming renewal"); *Grisham v. Lowery,* 621 S.W.2d 745, 751 (Tenn.App.1981) ("While [the landlord] did not help [the ten-

ants] to exercise their option, we find no duty on her to do so").

In the instant case, appellee's argument that appellant did not act in good faith was based solely upon appellants not informing appellee of the deficiencies in the submitted contracts that would constitute a failure to exercise the option. No evidence, however, has been presented of a deliberate act on the part of appellants to frustrate appellee's rights under the contract. Appellants did not insert terms repugnant to appellee; it was the other way around. Neither did appellants evade appellee's attempts to exercise the contract. They simply did not inform him of every deficiency in every attempt appellee made to exercise the option. To that end, we hold that a failure to inform the holder of an option right of material deficiencies when that right is attempted to be exercised, generally does not constitute a violation of the good faith requirement.

## IV. Conclusion

For the foregoing reasons, we hold that appellee never sufficiently exercised the option agreement at issue. Further, we hold that there is no violation of the good faith requirement where appellants did not inform appellee of the various material deficiencies in the attempts to exercise the option.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED. COSTS TO BE PAID BY APPELLEE.**